| | |
|---|---|
| **SHAUN DAVID BROOKS,** *Individually and as Administrator of the Estate of Cynthia Elaine Mixon,*<br><br>    *Plaintiff,*<br><br>**v.**<br><br>**WILKINSON COUNTY, GEORGIA,** *et al.,*<br><br>    *Defendants.* | **CIVIL ACTION NO.<br>5:17-cv-00033-TES** |

## ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND MOTION IN LIMINE

Cynthia Elaine Mixon entered the Wilkinson County Jail on Tuesday, January 27, 2015. The following day, she began displaying a variety of symptoms consistent with opioid withdrawal, including vomiting, diarrhea, and fever. Two days later, she suffered a seizure and ultimately died. Although the medical examiner concluded she died of hypertensive cardiovascular disease, Plaintiff, Mixon's son, disagrees. Plaintiff believes that Mixon died as a result of withdrawals from various drugs, including opioids and benzodiazepine, and that the conduct of several officials at Wilkinson County Jail, as well as the jail's policies, contributed to her death. He brings this action as the administrator of her estate and as an individual with a cause of action under Georgia's wrongful death statute.

Three groups of Defendants filed separate motions for summary judgment and all Defendants joined in a single motion in limine. *See* [Docs. 27, 42, 43 & 44]. Following extensive review of the parties' briefing and the record before it, the Court **GRANTS** Defendants Wilkinson County and Sheriff Richard Chatman's Motion for Summary Judgment [Doc. 27] on the basis of Eleventh Amendment immunity and **GRANTS in part** and **DENIES in part** Defendants Diane Lindsey, Laffiani Boyd and Jared Rickerson's Motion for Summary Judgment [Doc. 42] and Defendant Thomas King's Motion for Summary Judgment [Doc. 43]. Finally, the Court **GRANTS in part and DENIES in part** Defendants' Motion in Limine [Doc. 44].

To summarize the Court's ruling, Plaintiff may proceed against Defendants Lindsey, Boyd and King under § 1983 for their alleged deliberate indifference to Mixon's serious medical need and under Georgia law for allegedly breaching their ministerial duty to provide medical care to an inmate. As there has been no argument to the contrary, Plaintiff may still assert his wrongful death claim against these Defendants. Because there are no remaining claims against Defendants Wilkinson County, Sheriff Chatman or Rickerson, the Court **DIRECTS** the Clerk of Court to **TERMINATE** these Defendants as parties to this action.

## FACTUAL BACKGROUND

On Tuesday, January 27, 2015, at approximately 11:00 p.m., Defendant Rickerson booked Mixon into Wilkinson County Jail for possession of hydrocodone with intent to

distribute. *See* [Doc. 52, at ¶ 1; Doc. 27-9]. At the time of her booking, Mixon had valid prescriptions for and was taking: Xanax, Ambien, Soma, Morphine, Oxycodone, Adderall, Tegretol, Losartan, Prozac, Wellbutrin, Lidocaine Patch, and Ventolin Inhaler. [Doc. 52, at ¶ 1; Doc. 34-5]. Mixon discontinued her use of these drugs, albeit involuntarily, as a result of her detention. [Doc. 52, at ¶ 3; Doc. 56, at p. 26 ¶¶ 18–23].

When Mixon arrived at the Wilkinson County Jail, Defendant Rickerson performed Mixon's intake screening. [Doc. 52, at ¶¶ 3, 10–14; Doc. 27-2, at ¶¶ 55–60]. Per Wilkinson County Jail's written policy, Defendant Rickerson completed a Medical History Form and a Medical Receiving Screening Form as part of the booking process. [Doc. 52, at ¶ 10; Doc. 30-7, at pp. 6–7]. These screening forms consist of a series of standard medical questions that the intake officer asks the detainee and a place to record their responses. [Doc. 52, at ¶ 11; Doc. 30-7, at pp. 6–7]. Defendant Rickerson testified that Mixon denied having any medical problem listed on the medical screening forms and did not inform him of any of the numerous medications she was taking. [Doc. 39, at 70:4–6]. Mixon's medical screening forms reflect that she was not taking medications that needed to be continued while detained. [Doc. 35-3, at p. 3]. However, Plaintiff maintains that Defendant Rickerson failed to thoroughly screen Mixon as required. [1] [Doc. 52, at ¶¶ 3 &

---

[1] Plaintiff argues that four sources of evidence show that Defendant Rickerson's screening was inadequate. [Doc. 52, at ¶ 14]. First, Plaintiff cites jailer Sheila Cobb's testimony that, prior to Mixon's death, the jailers were not asking the questions on the medical screening report. [Doc. 36, at pp. 62–68]. Second, Plaintiff cites booking reports received in discovery that show an increase in medical detail after Mixon's death. [Doc. 52, at ¶¶ 18–27]. Third, Plaintiff cites Defendant Rickerson's "failure to record known medical information". [*Id*. at ¶ 28; Doc. 39, at pp. 70–76]. Finally, Plaintiff cites the video recording of the screening

14]. Plaintiff does not dispute that Defendant Rickerson never interacted with Mixon after performing this screening and that she was not displaying symptoms of withdrawal when Defendant Rickerson booked her into the jail. [Doc. 39, at pp. 106 & 107 ¶¶ 23–2; Doc. 52-3, at ¶ 8; Doc. 37, at pp. 52–53 ¶¶ 22–11]. After Defendant Rickerson booked Mixon in, Officer Bernice Ford dressed her out and took her to the female dorm.[2] [Doc. 27-2, at ¶ 67; Doc. 53, at ¶ 7].

The following morning, Mixon's friend, Neil Baggerly, visited the Wilkinson County Jail to deliver Mixon's prescribed oxycodone pills.[3] [Doc. 52, at ¶ 66; Doc. 30, at pp. 205–210]. Defendant King took the pills, but informed Baggerly that Mixon was not allowed to take that type of medication in the jail and that he would store the medication with her personal property. [Doc. 52, at ¶¶ 67–69; Doc. 30, at pp. 207–208]. Although former defendants Gary Butler and Sheila Cobb were also on duty that day, there is no evidence that they or any of the remaining Defendants knew that Mixon had a validly prescribed medication that she could not take while detained. [Doc. 27-2, at ¶ 70; Doc. 53, at ¶ 70].

At some point in the afternoon or early evening, Mixon began showing symptoms

---

[2] Officer Ford, along with Officers Gary Butler, Sheila Cobb and Eddie Williams, was a defendant in this action until terminated by a stipulation of dismissal agreed to by all of the remaining parties. *See* [Doc. 26].

which—he maintains—shows Defendant Rickerson filling out the screening form in a perfunctory fashion. [Doc. 52, at ¶ 31; Doc. 27-11].

[3] There is no evidence in the record that Baggerly attempted to deliver any of the other medications for which Mixon had prescriptions.

of opioid withdrawal that included vomiting, diarrhea, and the inability to get out of bed. [Doc. 52, at ¶ 70; Doc. 52-3, at ¶ 8]. Mixon told other inmates that she believed she was detoxing. [Doc. 52, at ¶ 71; Doc. 52-3, at ¶ 8]. At 6:00 p.m. on Wednesday, Defendants Boyd and Lindsey came on duty, relieving Officers Butler and Cobb. [Doc. 27-2, at ¶ 83; Doc. 53, at ¶ 83]. At some point that evening, Jessica Hartley, an inmate detained with Mixon, told Defendant Boyd that Mixon was vomiting and had a headache, so Defendant Boyd gave Hartley some Tylenol to give to Mixon.[4] [Doc. 27-2, at ¶ 85; Doc. 27-12, at 10:35–11:02; Doc. 31, at 32:4–24]. Later that evening, Hartley again spoke with Defendant Boyd and asked him to turn on the TV so that Mixon and another inmate would have some light when they got up to vomit; Defendant Boyd did so. [Doc. 31, at 33:5–9; Doc. 52-3, at ¶ 12].

By Thursday morning, Mixon's condition had worsened. [Doc. 52-3, at ¶ 16]. Plaintiff alleges that Mixon's symptoms included frequent vomiting, diarrhea, fever, shaking, severe fatigue and "he[r] heart felt like it was going to explode." [Doc. 52, at ¶ 81; Doc. 52-3, at ¶ 17]. Plaintiff also alleges that Hartley informed Defendant King of Mixon's condition, but he failed to do anything. [Doc. 52, at ¶¶ 82 & 83; Doc. 52-3, at ¶¶ 18 & 19]. Defendant King maintains that Hartley never told him that Mixon was detoxing,

---

[4] In his response to Defendants' Joint Statement of Material Facts, Plaintiff lists this fact as controverted. *See* [Doc. 53, at ¶ 85]. However, Plaintiff did not provide any evidence contradicting Defendant Boyd's recitation of this fact. Although Plaintiff submitted an affidavit in which another inmate swore that Defendant Boyd did not offer to get assistance for Mixon, this is insufficient to rebut Defendant Boyd's testimony that he provided Tylenol or ibuprofen to Mixon.

that he never spoke with Mixon about her condition, and that he believed Mixon only had stomach problems or cramping. [Doc. 30, at 218:18–25; 219:1–14].

On Thursday evening, Hartley again told Defendant Lindsey of Mixon's deteriorating condition and that she needed a doctor. [Doc. 52, at ¶ 85; Doc. 52-3, at ¶ 22]. Defendant Lindsey checked on Mixon, observed that she was "flushed," gave her some Tylenol, and told her that she would tell Defendant King to schedule her a visit with the doctor. [Doc. 52, at ¶ 89; Doc. 52-3, at ¶ 26; Doc. 38, at p. 133 ¶¶ 3–12, p. 135 ¶¶ 17–20]. Mixon told Defendant Lindsey that she was "okay" and that she was "just going to go to sleep."[5] [Doc. 38, at p. 133 ¶¶ 11 & 12]. Defendant Lindsey noted on the jail log that Mixon was vomiting, had a fever, and needed to see a doctor, but took no further action. [Doc. 52, at ¶ 90; Doc. 38, at p. 134 ¶¶ 2–6].

The following morning, Mixon began having seizures. [Doc. 52, at ¶ 93; Doc. 30, at p. 223 ¶¶ 17–21]. Officer Ford—a former defendant in this action—called EMS who transported Mixon to the hospital. [Doc. 27-2, at ¶ 143; Doc. 53, at ¶ 143]. The doctors pronounced Mixon dead shortly after she arrived. [Doc. 52, at ¶ 93; Doc. 30, at p. 227 ¶¶ 22–25]. The medical examiner who conducted Mixon's autopsy concluded that her cause of death was hypertensive cardiovascular disease.[6] *See* [Doc. 27-17, at p. 4]. However,

---

[5] Plaintiff disputes that Mixon told Defendant Lindsey she was okay. [Doc. 53, at ¶ 122]. Although Plaintiff offers facts that challenge Defendant Lindsey's credibility generally, Plaintiff does not offer evidence that rebuts this fact specifically. *See* [*id.*].

[6] Plaintiff's medical expert, Dr. Fowlkes, disputes this conclusion and instead believes Mixon died of acute benzodiazepine withdrawal. *See* [Doc. 52-12, at ¶ 3]. Dr. Fowlkes further opines that electrolyte

Plaintiff's expert witnessed opined that Mixon most likely died of a seizure caused by benzodiazepine withdrawal. *See generally* [Doc. 34-1].

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if the evidence would allow a reasonable jury to return a verdict for the nonmovant and a fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering this motion, "the evidence of the [nonmovant] is to be believed, and all justifiable inferences are to be drawn in [the nonmovant's] favor." *Id.* at 255. However, the Court need not draw "all possible inferences" in favor of the nonmovant. *Horn v. United Parcel Servs., Inc.*, 433 F. App'x 788, 796 (11th Cir. 2011).

The movant "bears the initial burden of informing the district court of the basis for its motion[] and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (internal quotation omitted) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant "to

---

derangement caused by Mixon's opioid withdrawal symptoms cannot be "determined to be causative or excluded." [*Id.*].

rebut that showing by producing affidavits or other relevant and admissible evidence beyond the pleadings." *Jones*, 683 F.3d at 1292 (quoting *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2012)). Alternatively, a movant may prevail on a motion for summary judgment by showing that the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp.*, 477 U.S. at 323.

## DISCUSSION

### A.      Defendants' Wilkinson County and Chatman's Motion for Summary Judgment [Doc. 27][7]

The Court grants Defendants Wilkinson County and Chatman's Motion for Summary Judgment because the promulgation of policies related to the provision of healthcare in county jails is a state, rather than a county, function as a matter of Georgia law. Consequently, Plaintiff cannot show that Mixon was harmed by an unconstitutional policy promulgated by Defendant Wilkinson County. Moreover, because Defendant Chatman was acting as an arm of the state in establishing healthcare policies in Wilkinson County Jail, he is cloaked with Eleventh Amendment Immunity.

The Eleventh Amendment protects a state from an unconsented-to suit in federal court. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). This immunity

---

[7] There was some confusion as to whether Plaintiff asserted claims against Defendant Chatman in his individual capacity. *See* [Doc. 27-1, at p. 15]. However, Plaintiff unequivocally stated that he only asserts an official-capacity claim against Defendant Chatman. *See* [Doc. 49, at p. 15 n.14].

from suit does not apply to local governments—such as Defendant Wilkinson County—but does protect individuals acting as "arms of the state." *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 n.54 (1978); *see also Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003). In *Manders*, the Eleventh Circuit summarized when Eleventh Amendment immunity protects defendants that are not technically the State, but are acting as an arm of the state:

> Eleventh Amendment immunity bars suits brought in federal court when the State itself is sued and when an arm of the State is sued. To receive Eleventh Amendment immunity, a defendant need not be labeled a 'state officer' or 'state official,' but instead need only be acting as an 'arm of the State,' which includes agents and instrumentalities of the State. Whether a defendant is an 'arm of the State' must be assessed in light of the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise.

*Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003) (internal citations omitted). The court then described its familiar, four-factor test for determining whether an official is acting as an arm of state: "(1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity." *Id.* at 1309. Other courts applying this test have concluded that a variety of government officials are (and are not) arms of the state depending not only on their position, but also the specific factual context in which they were exercising their authority. *See, e.g., Pelliterri v. Prine*, 776 F.3d 777, 780 (11th Cir. 2015) (holding that sheriff was acting as arm of the state when he refused to rehire a deputy sheriff); *Temple v. McIntosh Cty.*, No. 2:18-cv-91, 2019 WL 287482, at *4 (S.D. Ga. Jan. 22,

2019) (holding that sheriff was an acting as arm of the state when performing traditional law enforcement function). *But see Dukes v. Georgia*, 428 F. Supp. 2d 1298 (N.D. Ga. 2006) (holding that sheriff was not acting as arm of the state when providing medical care to inmates in county jail); *Lightfoot v. Henry Cty. Sch. Dist.*, 771 F.3d 764, 767 (11th Cir. 2014) (holding that school district and school board are not arms of the state); *Miller v. Advantage Behavioral Health Sys.*, 677 F. App'x 556, 558 (11th Cir. 2017) (holding that community service board was not acting as arm of the state in ADEA discrimination suit).

With this background law in mind, the issue now before the Court is whether a sheriff acts as an arm of the state in providing medical care to inmates in a county jail. This is not the first time a court in this district has confronted this issue. In *Youngs v. Johnson*, the plaintiff alleged that while he was detained at Muscogee County Jail, he fractured his hip when another inmate attacked him. No. 4:06-cv-19 (CDL), 2008 WL 4816731, at *3 (M.D. Ga. Oct. 30, 2008). Plaintiff alerted the jailers on duty that he hurt his leg in an altercation with the other inmate, but they did not treat his injury as an emergency until approximately seven hours after they were informed of his injury. *Id.* at *4. Plaintiff filed a § 1983 claim against the sheriff of Muscogee County in his official capacity for the delay in treating his fractured hip and the sheriff asserted Eleventh Amendment immunity. *Id.*

Applying the *Manders* factors, the court concluded that the sheriff's provision of medical care to inmates in a county jail is a county rather than a state function. *Id.* at *8.

In reaching this conclusion, the court relied heavily on Georgia Code Annotated § 42-5-2(a) ("the Statute") which makes it the duty of the "governmental unity, subdivision, or agency having the physical custody of an inmate to maintain the inmate, furnish him food, clothing, and any needed medical and hospital attention." Based on the Statute, the court found that the first factor weighed against finding that the Sheriff was acting as an arm of the state because "[a]lthough the sheriff's obligation to provide county inmates with medical services is directly derived from the State, the provision of medical care is directly delegated through the county entity." *Id.* at *7. The court likewise found that the second factor weighed against the Sheriff because the Statute gave counties control over the maintenance of their jails. *Id.* Finally, the court found that the third factor weighed against finding that the Sheriff was acting as an arm of the state because the Statute required counties to pay for medical necessities. *Youngs*, 2008 WL 4816731, at *8. Although the Court found that the fourth factor weighed in favor of finding that the sheriff was acting as an arm of the state because the State could be liable for paying for a judgment against the sheriff, the Court concluded that the other three factors outweighed this factor. *Id.* Other cases, with varying degrees of thoroughness, agreed with the result in *Young. See Trammell v. Paxton*, Civil Action File No. 2:06–CV–193, 2008 WL 7514367, at *15 (N.D. Ga. Sept. 29, 2008); *Hooks v. Bogdon*, No. 7:05-CV-42 (HL), 2007 WL 2904009, at *2 (M.D. Ga. Sept. 29, 2007); *Dukes v. Georgia*, 428 F. Supp. 2d 1298, 1321–22 (N.D. Ga. 2006); *Green v. Glynn Cty.*, No. Civ. A. CV201-52, 2006 WL 156873, at *3 (S.D. Ga. Jan. 19,

2006)).

And then came *Lake v. Skelton*, 840 F.3d 1334 (11th Cir. 2017). In *Lake*, the Eleventh Circuit held that a sheriff is entitled to Eleventh Amendment immunity with regard to the provision of food to inmates in county jails. In reaching this conclusion, the Court applied the four *Manders* factors, but rejected the reasoning of the *Youngs* court along the way. Beginning with the first factor, the Court held that, with respect to county jails, Georgia Code Annotated § 42-5-2 "imposes two separate duties: the county must fund the provision of medical care, and the sheriff must select an appropriate provider and ensure that inmates receive care when necessary." *Id.* at 1341. In other words, the Court rejected *Youngs*'s position that counties in Georgia delegate their duties under Georgia Code Annotated § 42-5-2 to the county sheriff. Instead, the Court explained, any duty a county sheriff has under Georgia Code Annotated § 42-5-2 is directly imposed by the State. *Id.* In short, the Eleventh Circuit rejected *Youngs*'s reasoning as to the first *Manders* factor and found that this factor weighed in favor of finding that the sheriff was entitled to Eleventh Amendment immunity.

The Court then turned its attention to the second *Manders* factor and concluded that state law vests control over the provision of food in the State rather than the county. *Id.* at 1342–43. In reaching this conclusion, the Court relied on the fact that a State statute guaranteed inmates certain minimum standards of access to food while detained. *Id.* (citing Ga. Code Ann. §§ 42-4-32). Georgia has similar statutes guaranteeing inmates in

jails minimum access to medical care. *See* Ga. Code Ann. § 42-4-32. The final departure

from the *Youngs* decision relates to the third *Manders* factor. While the *Youngs* court

focused on whether the State or county funded the function at issue (the provision of

medical care), the *Lake* Court focused on which entity funded the sheriff's office generally.

*Compare Youngs*, 2008 WL 4816731, at *8 *with Lake*, 840 F.3d at 1343–44. Because the State

is responsible for funding the sheriff's office, the *Lake* Court concluded that this factor

weighed in favor of finding that the sheriff was entitled to Eleventh Amendment

immunity. *Lake*, 840 F.3d at 1343–44.

 After the Eleventh Circuit decided *Lake*, another court in this district again

considered whether a sheriff acts as an arm of the state when he provides medical care to

an inmate in a county jail. *See Palmer v. Correct Care Sols., LLC*, 291 F. Supp. 3d 1357, 1366

(M.D. Ga. 2017). In *Palmer*, the court concluded that

> Although the Eleventh Circuit has not yet held that a Georgia Sheriff is
> protected by the Eleventh Amendment for his failure to provide
> constitutionally mandated medical care to county jail detainees, a
> constitutional claim arising from the failure to provide food, which the
> Eleventh Circuit held in *Lake* [] cannot be asserted against a Georgia sheriff
> in his official capacity in federal court because of the Eleventh Amendment,
> appears indistinguishable for Eleventh Amendment purposes from a claim
> arising from the failure to provide medical care.

*Id.* at 1360. The *Palmer* court went on to note that it was likely sufficient to rest its holding

on the proposition that "because the provision of medical care cannot be distinguished

from the provision of food for Eleventh Amendment purposes, *Lake* [] requires a finding

of immunity in this case." *Id.* at 1362. Nevertheless, the *Palmer* court performed a full

*Manders* analysis—informed by the Eleventh Circuit's guidance in *Lake*—and concluded—as expected—that a sheriff is entitled to Eleventh Amendment immunity when providing medical care to inmates in county jails. *See id.* at 1363–66.

The Court agrees with the court in *Palmer* that it was probably unnecessary for it to conduct its own *Manders* analysis in light of *Lake*, and, in an effort to avoid reinventing the wheel (particularly a wheel as well made as *Palmer*), the Court will rest its decision on the proposition that "because the provision of medical care cannot be distinguished from the provision of food for Eleventh Amendment purposes, *Lake* [] requires a finding of immunity in this case." *Id.* at 1362. Thus, the Court finds that, under Georgia law, a sheriff acts as an arm of the state when he provides medical care to inmates in a county jail and is therefore entitled to Eleventh Amendment immunity. Consequently, Defendant Chatman is entitled to Eleventh Amendment immunity in this case.

As noted above, Defendant Wilkinson County is also entitled to summary judgment because Mixon did not die as a result of an official policy promulgated by Defendant Wilkinson County. As a local government, the Eleventh Amendment does not protect Defendant Wilkinson County from liability. *See Monell*, 436 U.S. at 690 n.54. However, "[i]t is only when the execution of the government's policy or custom . . . inflicts the injury that the municipality may be held liable under § 1983." *Springfield v. Kibbe*, 480 U.S. 257, 267 (1987) (internal quotations omitted). In short, local governments are not vicariously liable for injuries caused by their employees. *See City of Canton v. Harris*, 489

U.S. 378, 385 (1989) ("*Respondeat superior* or vicarious liability will not attach under § 1983."). Thus, the Court's first task in assessing whether a local government is subject to liability under § 1983 for a particular harm is to locate an official local government policy or custom that caused the harm. *See id.*

In this case, Plaintiff argues that Defendant Wilkinson County had an official policy of "drying out" inmates who were going through drug withdrawal and a policy of failing to adequately screen incoming inmates for medical conditions. *See* [Doc. 49, at pp. 5–18]. Assuming for the sake of this motion only that these policies and customs actually existed, it cannot be said that these policies were promulgated by an official policymaker for Defendant Wilkinson County. For starters, both policies related to medical care in a county jail, which the *Lake* court concluded was the exclusive policy arena of the county sheriff as a matter of Georgia law. *See Lake*, 840 F.3d at 1341 (concluding that sheriff acts on behalf of the State when promulgating policies related to the provision of food and healthcare in county jails and that county's exclusive function is to fund provision of the same). Thus, if Defendant King, as jail administrator, was promulgating policies related to the provision of medical care in the county jail, he must have done so based on authority delegated to him by Defendant Chatman.

The record confirms that Defendant King made policy decisions for the county jail under the direction of Sheriff Chatman and notified the sheriff of even minor changes in "unwritten policies" such as choosing suppliers for the commissary. *See* [Doc. 30, at pp.

15

99:6–24, 103:6–12]. Because Defendant King was promulgating policies based on authority delegated to him from Sheriff Chatman, the policy decisions he made cannot be attributed to Defendant Wilkinson County. *See Lake*, 840 F.3d at 1342 (holding that where defendant's functions derive from sheriff's authority under state law, that defendant is also performing a state rather than county function). Thus, Defendant Wilkinson County is also entitled to summary judgment.

### B. Defendants Lindsey, Boyd and Rickerson's Motion for Summary Judgment [Doc. 42]

The Court turns its attention to Defendants Lindsey, Boyd and Rickerson's Motion for Summary Judgment. As discussed previously, Plaintiff asserts claims against Defendants Boyd and Lindsey under § 1983 for their alleged deliberate indifference to Mixon's serious medical need.[8] *See* [Doc. 1, at ¶¶ 115–131]. Plaintiff also asserts state-law claims against these Defendants and Defendant Rickerson for negligent failure to provide medical care. *See* [*Id.* at ¶¶ 168–183].

### 1. § 1983 Deliberate Indifference Claim

Defendants Lindsey and Boyd argue that they are entitled to qualified immunity with regard to Plaintiff's deliberate indifference claim. *See* [Doc. 42-1, at pp. 3–13].

---

[8] Nowhere in this count of his Complaint does Plaintiff assert a deliberate indifference claim against Defendant Rickerson. Nevertheless, Defendants Lindsey, Boyd and Rickerson argued in their motion that Mixon did not display an objectively serious medical need while Defendant Rickerson was on duty and, in his response, Plaintiff purported to withdraw his deliberate indifference claim against Defendant Rickerson. *See* [Doc. 42-1, at pp. 5–6; Doc. 50, at p. 2 n.2]. Obviously, there was some confusion about whether Plaintiff asserted a deliberate indifference claim against Defendant Rickerson. So, to resolve this confusion, the Court states unequivocally that there is no deliberate indifference claim against Defendant Rickerson.

Predictably, Plaintiff disagrees. Whether a defendant is entitled to qualified immunity begins with a two-step burden-shifting analysis:

> the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred . . . . Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate.

*Penley v. Eslinger*, 605 F.3d 843, 849 (11th Cir. 2010) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)). Defendants Lindsey and Boyd argue that "[a] jail official performing law enforcement duties [is] clearly acting within their discretionary authority." [Doc. 42-1, at p. 3] (citing *Skrtich v. Thornton*, 280 F.3d 1295, 1303 (11th Cir. 2002). Plaintiff does not dispute this. Because the Court agrees that Defendants Lindsey and Boyd acted within their discretionary authority, the burden shifts to Plaintiff to show that these Defendants are not entitled to qualified immunity.

A plaintiff shows that a defendant is not entitled to qualified immunity by alleging facts that would support a finding that "the official's conduct violate[d] clearly established law." *Lee*, 284 F.3d at 1194. Thus, Plaintiff must show that Defendants Lindsey and Boyd actually violated Mixon's rights and the right was clearly established at the time of the incident. *Id.* The analysis can begin with either element. *Keith v. Dekalb Cty.*, 749 F.3d 1034, 1048 (11th Cir. 2014).

The Court begins with the question of whether Plaintiff sufficiently alleged a constitutional violation. Plaintiff alleges that Defendants Lindsey and Boyd's deliberate

indifference to Mixon's serious medical need violated her constitutional rights. In *Farrow v. West*, the Eleventh Circuit summarized the requirements for a deliberate indifference claim:

> To show that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and a subjective inquiry. First, a plaintiff must set forth evidence of an objectively serious medical need. Second, a plaintiff must prove that the prison official acted with an attitude of "deliberate indifference" to that serious medical need.

320 F.3d 1235, 1243 (11th Cir. 2003) (internal citations omitted). A medical need is objectively serious if it "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow*, 320 F.3d at 1243 (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994)). Alternatively, a plaintiff can establish an objectively serious medical need by showing that a delay in treatment worsens the condition. *See Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009). Under any of these approaches, a plaintiff must show that "the medical condition . . ., if left unattended, poses a substantial risk of serious harm." *Id.* (alterations and quotations omitted).

To establish deliberate indifference, Plaintiff must show that Defendants Lindsey and Boyd (1) had subjective knowledge of a risk of serious harm; (2) disregarded that risk; (3) by conduct that was more than grossly negligent. *See Townsend v. Jefferson Cty.*, 601 F.3d 1152, 1158 (11th Cir. 2010). Finally, as with all § 1983 claims, Plaintiff must show that the alleged constitutional violation caused Mixon's injuries. *See Troupe v. Sarasota*

*Cty.*, 419 F.3d 1160, 1165 (11th Cir. 2005). As explained more fully below, questions of fact remain that prevent the Court from granting Defendants Lindsey and Boyd qualified immunity on this claim.

### a.  Serious Medical Need

It is not entirely clear to the Court whether Defendants Lindsey and Boyd concede that drug withdrawals present a serious medical need. On the one hand, Defendant Boyd openly conceded in his deposition that drug withdrawals are a serious medical need. *See* [Doc. 31, 75:7–9]. Defendant Lindsey effectively conceded the same. *See* [Doc. 38, at 114:4–13]. *See also* [Doc. 27-2, at ¶ 32] (Defendants stating that it is undisputed that drug withdrawals require prompt medical attention). On the other hand, they argue in their Motion for Summary Judgment that "Plaintiff cannot show that [Mixon] had an objectively serious medical need until . . . [she] experienced a seizure." [Doc. 42-1, at p. 4]. Defendants Lindsey and Boyd's about-face on this issue is no doubt cause for some head scratching, but, whatever the cause, the Court finds that Plaintiff has offered plenty of evidence that Mixon was actually suffering from drug withdrawals in the days leading up to her death and that drug withdrawals satisfy the standard for a serious medical condition outlined in *Mann*. *See* [Doc. 52-12, at p. 1]. *See also Mann*, 588 F.3d at 1307 (holding that a medical condition is a serious medical need if the condition worsens over time).

With regard to the *Mann* standard, Plaintiff's expert opined that, although opioid

withdrawals are self-limiting, the associated symptoms and side effects—like electrolyte derangement—can get worse over time. *See* [Doc. 34-1, at p. 14]. Additionally, there is evidence that a lay person did in fact recognize the seriousness of Mixon's symptoms and recommend that Defendants Lindsey and Boyd get her treatment, thus satisfying the *Farrow* standard for an objectively serious medical need. *See* [Doc. 52-3, at ¶ 10]. Consequently, Plaintiff has provided sufficient evidence on this element of his claim to survive summary judgment.

### b. Subjective Knowledge of Risk of Harm

A question of fact remains as to whether Defendants Lindsey and Boyd had subjective knowledge of the fact that Mixon was at substantial risk of suffering a serious harm. To establish that a defendant has subjective knowledge of a risk of serious harm, a "[p]laintiff must demonstrate that a Defendant was 'both [ ] aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [ ] must also [have] draw[n] the inference.'" *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)) (alterations in original). As *Burnette* makes clear, Plaintiff need not offer evidence that Defendants Lindsey and Boyd had positively diagnosed Mixon's condition. *See id.* Instead, it is enough for Plaintiff to introduce evidence that Defendants Lindsey and Boyd were aware that there was a substantial risk that Mixon's condition—whatever its cause—was medically serious. *See id.* "Whether a prison official had the requisite knowledge of a substantial risk is a

question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842.

Viewing the evidence as mandated by the summary-judgment standard shows that Defendants Lindsey and Boyd knew about Mixon's vomiting, diarrhea, fever, headache and weakness; that these symptoms were indicative of drug withdrawals; and that inmate Hartley believed Mixon was detoxing. *See* [Doc. 52-3, at ¶¶ 10, 11, 22 & 23]. Thus, a jury could find that Defendants Lindsey and Boyd were aware of facts that could support an inference that there was a substantial risk of serious harm to Mixon. The next question, under *Burnette*, is whether there is evidence that they drew such an inference.

Although the evidence—at least in the Court's view—is scant, Plaintiff has provided sufficient evidence to get to a jury on the question of whether Defendants Lindsey and Boyd knew that Mixon was suffering from a serious medical condition. This case brings to mind the case of *Harper v. Lawrence Cty.*, in which the Eleventh Circuit held that a plaintiff—the administrator of the estate of a deceased inmate—had sufficiently alleged that two defendant jailers had actual knowledge of the deceased inmate's serious medical need. 592 F.3d 1227, 1234–35 (11th Cir. 2010). The plaintiff in *Harper* alleged that other inmates had informed the defendants of the deceased inmate's symptoms and that these symptoms could be indicative of a serious medical need. *Id.*

So too here. There is evidence that another inmate—Hartley—told Defendants Lindsey and Boyd that Mixon was suffering from symptoms known to them to be

consistent with drug withdrawal and that they were aware that drug withdrawals pose a substantial risk of serious harm. *See* [Doc. 27-2, at ¶ 32; Doc. 38-6, at p. 7]. *Harper* suggests that this alone may be enough.[9] But the evidence actually goes further in that it shows that Hartley outright told Defendants Lindsey and Boyd that Mixon was detoxing. *See* [Doc. 52-3, at ¶¶ 10 & 11]. Thus, there is *some* evidence that this case is not simply an instance of Defendants Lindsey and Boyd failing to contemplate the possibility that Mixon was suffering from drug withdrawal because there is evidence that they were confronted with that very possibility. In light of this circumstantial evidence, as bare as it may be, the Court is obligated to conclude that Plaintiff has provided sufficient evidence to get to a jury on this part of his claim. *See generally Sears v. Roberts*, 922 F.3d 1199 (11th Cir. 2019) (holding that a district court may not weigh competing evidence even where the district court believes the evidence supporting one side's recitation of the facts is unpersuasive).

Defendants Lindsey and Boyd argue that *Harper* doesn't control here because they did not observe the same serious symptoms that the defendants in that case did. *See* [Doc.

---

[9] The Court is mindful of the long line of Eleventh Circuit cases holding that misdiagnosis by a medical professional is not evidence of that individual's actual knowledge of a substantial risk of serious harm. *See e.g., Mitchell v. McKeithen*, 672 F. App'x 900, 903 (11th Cir. 2016); *McElligot v. Foley*, 182 F.3d 1248, 1256 (11th Cir. 1999). Although the analogy is tempting, the Court finds that those cases are inapposite here. Those cases involve positive diagnoses by medical professionals rather than the "wait and see" approach apparently adopted by Defendants Lindsey and Boyd—individuals whose training was limited to identifying medical risks rather than weighing them. The long and the short of it is that *Harper* suggests that, when it comes to evaluating medical risks, defendants in Lindsey and Boyd's position must "leave it to the professionals."

60, at p. 4]. While it may be true that the inmate in *Harper* displayed symptoms that *may* have constituted a serious medical need in and of themselves, nothing in *Harper*—or any other case the Court is aware of—suggests that the symptoms known to a defendant *must* be so serious that they constitute a serious medical need in their own right before *Harper* becomes applicable. The Court is satisfied that Plaintiff created a jury question on the issue of Defendants Lindsey and Boyd's knowledge when he submitted evidence that they knew the symptoms of drug withdrawal, were aware that Mixon was suffering from these symptoms, and another inmate raised the possibility to them that Mixon was going through drug withdrawals.

b. **Disregard of Substantial Risk by Conduct that was More than Grossly Negligent**

The Court is also satisfied that Plaintiff has provided sufficient evidence from which a reasonable jury could conclude that Defendants Lindsey and Boyd disregarded the risk of substantial harm to Mixon by conduct that was more than grossly negligent. It is well established in the Eleventh Circuit that a prison official's conduct exceeds gross negligence when he knows that an inmate has a serious medical need but fails entirely to provide care to that inmate. *See McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) (citing *Lancaster v. Monroe Cty.*, 116 F.3d 1419, 1425 (11th Cir. 1997)). Later decisions from the Eleventh Circuit have clarified that not just any treatment will do—an inmate is constitutionally entitled to medical care that is adequate to meet the needs of their particular situation. *See Bingham v. Thomas*, 654 F.3d 1171, 1176 (11th Cir. 2011) (holding

that inadequate or cursory care can give rise to a claim for deliberate indifference).

Although Defendants Boyd and Lindsey acquiesced to all of Mixon's medical requests and took some basic steps to alleviate Mixon's symptoms, if a jury finds that either of them had subjective knowledge of the seriousness of Mixon's condition, then the medical care they provided could be characterized as either "grossly inadequate" or "so cursory as to amount to no treatment at all." *Bingham*, 841 F.3d at 1223. *See also* [Doc. 27-2, at ¶ 85; Doc. 27-12, at 10:35–11:02; Doc. 31, at 32:4–24 & 33:5–9; Doc. 52-3, at ¶ 12]. After all, if Defendants Lindsey and Boyd were aware of a substantial risk that Mixon was suffering from drug withdrawal, then they were obligated to seek professional medical care for her, not just provide ibuprofen. *See* [Doc. 38-6, at p. 7].

Because the Court finds that disputes of fact remain as to what Mixon was suffering from and whether Defendant Lindsey and Boyd were aware of the "substantial risk of serious harm" to Mixon, the Court denies their Motion for Summary Judgement as to Plaintiff's federal claims against them.

### c.      Causation

Finally, the Court finds that whether Defendants Lindsey and Boyd's alleged deliberate indifference caused Mixon's injuries is a question for the jury. As any first-year law student can tell you, a plaintiff must show that the conduct complained of was the "but for" and proximate cause of their injuries. *See Smith v. City of Oak Hill*, 587 F. App'x 524, 527 (11th Cir. 2014). "But for" causation exists when a plaintiff shows that "except

for the constitutional tort, such injuries and damages would not have occurred." *Id.* Proximate causation exists when "the injury or damage was a foreseeable consequence of the [defendant's] act or omission." *Jackson v. Sauls*, 206 F.3d 1156, 1168 (11th Cir. 2000). Questions of proximate causation are almost always left to a jury. *See id. See also Sanders v. Lull Int'l, Inc.*, 411 F.3d 1266, 1271 (11th Cir. 2005).

Defendants Lindsey and Boyd argue that Mixon's failure to ask them for medical care or even inform that she was experiencing drug withdrawals severs the causal connection between their conduct and Mixon's injury. *See* [Doc. 42-1, at p. 13]. This is not so. If anything, this is an argument in mitigation of their liability that Mixon was negligent in her own right by failing to inform Defendants Lindsey and Boyd of her condition or otherwise taking steps to secure her own care. But the Court simply fails to see how this failure on Mixon's part severs the causal chain as Defendants Lindsey and Boyd suggest.

In their reply brief, Defendants Lindsey and Boyd raise a much more persuasive argument that is later echoed by Defendant King in his Motion for Summary Judgment. They argue that "[e]ven if one assumes that Defendants knew [Mixon] was withdrawing from oxycodone and was having associated withdrawals issues, treatment of [Mixon]'s opiate withdrawal symptoms would not have prevented [her] death from benzodiazepine withdrawal." [Doc. 60, at p. 7]. *See also* [Doc. 43-1, at p. 9]. In other words, Defendants Lindsey, Boyd and King ask the Court to conclude, as a matter of law, that their deliberate indifference to Mixon's opioid withdrawals was not the proximate cause

of her death because it was impossible for them to have known—prior to Mixon's seizure—that she was also withdrawing from benzodiazepine. This argument arises from Dr. Fowlkes's opinion that Mixon's first clear symptom of benzodiazepine withdrawal was the seizure she suffered prior to her death, for which she received prompt, though ultimately ineffective, treatment. *See* [Doc. 34, at 112:12–15]. In response, Plaintiff argues that these Defendants did not need to be on notice of the specific form of Mixon's withdrawals, only that she was suffering from a serious medical condition. *See* [Doc. 51, at p. 14–15].

While the Court acknowledges that Plaintiff's causal theory is somewhat attenuated, it concludes that the question of proximate cause is best reserved for a jury for a couple of reasons. First, and perhaps most importantly, the general—indeed nearly inviolable—rule is that questions of proximate causation are for the jury, and the Court is extremely reluctant to remove these questions from the jury's rightful purview, except where the law is clear that it must do so. *See Sanders*, 411 F.3d at 1271. Second, every step of Plaintiff's causal theory is supported by evidence. Dr. Fowlkes opined that if Mixon had received care for her opioid withdrawals, a doctor would have reviewed her medical history, discovered that she was also at risk of benzodiazepine withdrawal, and implemented a benzodiazepine taper to avoid the deadly effects of benzodiazepine withdrawal. *See* [Doc. 52-12, at ¶¶ 5–8]. Finally, Plaintiff is not asking the Court to allow him to argue to the jury that the medical condition Mixon ultimately died of was entirely

unrelated to her opioid withdrawals. Instead, Plaintiff argues that Mixon died of benzodiazepine withdrawal, a condition that a jury could find was predictably associated with opioid withdrawals. Applying the basic "foreseeable harm" standard that makes up the proximate cause analysis leads to the conclusion that this issue is best reserved for the jury. There is evidence that Defendants Lindsey, Boyd and King knew that Mixon was suffering from symptoms of drug withdrawals that were indicative of opioid withdrawals. Based on this evidence, a jury could conclude that it was foreseeable to these Defendants that Mixon might also suffer withdrawals from other controlled substances.

### d.    Clearly Established Right

The Court finds that the law was clearly established at the time of the conduct complained of that a jail official could not knowingly disregard a substantial risk of a serious harm to an inmate posed by an untreated medical condition. *See McElligott*, 182 F.3d at 1260. *See also Melton v. Abston*, 841 F.3d 1207, 1229 (11th Cir. 2016) (holding that law is clearly established that knowingly delaying necessary medical treatment violates inmate's constitutional rights). Defendants Lindsey and Boyd do not argue this point, but Plaintiff cites several cases that affirm this rule. *See* [Doc. 51, at p. 15] (quoting *Lancaster*, 116 F.3d 1425. In light of this precedent, the Court has no trouble concluding that, if a jury finds Defendants Lindsey and Boyd did knowingly disregard a substantial risk of serious harm to Mixon, then they violated her clearly established rights.

2.     **State-Law Claims**

Plaintiff also asserts various state-law claims against Defendants Lindsey, Boyd and Rickerson. The Court finds that Defendant Rickerson is entitled to official immunity from Plaintiff's state-law claims, but fact questions remain that preclude a finding that Defendants Lindsey and Boyd are entitled to official immunity.

Under Georgia law, "state officers and employees and those of its departments and agencies are subject to suit only when they negligently perform or fail to perform their 'ministerial functions' or when they act with actual malice or intent to cause injury in the performance of their 'official functions.'" *Gilbert v. Richardson*, 452 S.E.2d 476, 483 (Ga. 1994). This protection from suit is known as official immunity. *Id.* Thus, what Plaintiff must show for his state-law claims against Defendants Lindsey, Boyd and Rickerson depends on whether the acts giving rise to Plaintiff's claims were ministerial or discretionary in nature. If the acts were ministerial, Plaintiff need only show that these Defendants performed that act negligently. *Id.* If the acts were discretionary, Plaintiff must show that Defendants performed that act with actual malice. *Id.*

The obvious starting point, then is to first characterize the nature of each Defendants' acts as either ministerial or discretionary. Georgia case law is replete with instances drawing distinctions between ministerial and discretionary duties but, put simply,

> [a] ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely

the execution of a specific duty. A discretionary act, however, calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed.

*Murphy v. Bajjani*, 647 S.E.2d 54, 57 (Ga. 2009) (quotation and citation omitted). Although the Georgia courts have reduced this component of the official immunity analysis down to a succinct definition, they frequently acknowledge that whether a duty in a particular instance is ministerial or discretionary must be determined on a case-by-case basis. *See McDowell v. Smith*, 678 S.E.2d 922, 925 (Ga. 2009). Once the Court categorizes the nature of the act each Defendant undertook, the Court must then decide whether there is sufficient evidence to create a jury question as to whether each Defendant acted with the requisite level of culpability. Because Plaintiff asserts that Defendant Rickerson breached a different duty than Defendants Lindsey and Boyd, the Court addresses Plaintiff's claim against him separately.

### a.    State-Law Claim Against Defendant Rickerson

The Court finds that Defendant Rickerson is entitled to official immunity with regard to Plaintiff's state-law claims. Plaintiff argues that Defendant Rickerson had a ministerial duty to perform Mixon's medical screening because Wilkinson County Jail's written policies required Defendant Rickerson to complete the medical screening forms; ask each question on the screening form and ensure that the inmate understands the questions being asked; and record any medical needs the inmate may have. [Doc. 50, at pp. 15–16]. Plaintiff further notes that Defendant Rickerson concedes that he did not have

the discretion to skip questions and that his exclusive function was to ask questions and record answers. [*Id.* at p. 16]. In his words, the medical screening process was "cut and dry." [*Id.*] On the other hand, Defendant Rickerson argues that performing medical screenings include some discretion elements such as how long to spend on each question and whether to have the inmate provide verbal or written responses. [Doc. 42-1, at pp. 14–15].

The Court finds that Defendant Rickerson was performing a ministerial duty when he conducted Mixon's medical screening. By Defendant Rickerson's own admission, the medical screening process is "cut and dry"—which suggests that this is the type of "absolute" or "definite" function within the definition of a ministerial duty. [Doc. 39, at 40:15–21]. The Court's conclusion is reinforced by *Meagher v. Quick,* in which the Georgia Court of Appeals held that a defendant police officer breached his ministerial duty when he failed to complete a statutorily mandated Family Violence Report following an investigation into domestic violence. 594 S.E.2d 182 (Ga. Ct. App. 2003). Although *Meagher* involved a complete failure on the part of the officer to complete the form rather than negligence in completing the form, a later Georgia Supreme Court case suggested that *Meagher* stands for the proposition that filling out required forms is a ministerial duty. *See Pearce v. Tucker*, 787 S.E.2d 749, 752 (Ga. 2016). As for Defendant Rickerson's argument that he exercised discretion over how long to spend on each question, the evidence is to the contrary. Wilkinson County Jail's policies required Defendant

Rickerson to spend as much time as necessary to ensure that the inmate understood the question being asked. *See* [Doc. 40-1, at p. 29]. Obviously, Defendant Rickerson exercises his judgment in determining whether an inmate understands each question, but where, as here, a plaintiff alleges that a defendant failed to perform a duty entirely, such a failure would constitute the breach of a ministerial duty.

Having concluded that Defendant Rickerson was performing a ministerial function when he conducted Mixon's medical screening, the next question is whether Plaintiff provided sufficient evidence to create a jury question as to whether Defendant Rickerson negligently breached this duty and thereby caused Mixon's injuries. With regard to the first part of this question—whether Defendant Rickerson breached his duty—Plaintiff provided sufficient evidence to create a question for the jury on this issue. Although Defendant Rickerson testified that he conducted Mixon's medical screening as required, former Defendant Cobb testified that, as a matter of practice prior to Mixon's death, the other jailers, including Defendant Rickerson, did not complete the medical screening forms as required by policy. *See* [Doc. 36, at pp. 62–72]. Plaintiff's expert also opined that, based on his experience with medical screening forms in jails, Mixon's intake should have taken far longer than the approximately one minute and 20 seconds that it took Defendant Rickerson to complete Mixon's screening. *See* [Doc. 34, at 39:17–40:9]. This evidence is sufficient to create a jury question on whether Defendant Rickerson negligently breached his ministerial duty.

However, the Court finds that Plaintiff failed to produce sufficient evidence on the issue of causation. Under Georgia law, a plaintiff seeking to recover in a negligence action must prove "that the defendant's negligence was both the 'cause in fact' and the 'proximate cause' of the injury." *City of Richmond Hill v. Maia*, 800 S.E.2d 573, 576 (Ga. 2017) (punctuation omitted). To establish that Defendant Rickerson's conduct was the "cause in fact" of his injury, Plaintiff must show that "but for [the defendant's] conduct, he would not have sustained the injury." *Strength v. Lovett*, 714 S.E.2d 723, 730 (Ga. Ct. App. 2011). "Proximate cause is that which in the natural and continuous sequence, unbroken by other causes, produces an event, and without which the event would not have occurred." *Zwiren v. Thompson*, 578 S.E.2d 862, 865 (Ga. 2003) (quotations omitted). Although the question of causation is typically reserved for the jury, summary judgment for the defendant is appropriate if the plaintiff fails to introduce sufficient evidence to support each inference required to establish causation. *See, e.g., Jackson v. Thom*, 57 S.E.2d 234, 235–36 (Ga. Ct. App. 1950) (requiring evidence to support each inference required to prove theory of causation); *Yearty v. Scott Holder Enters., Inc.*, 824 S.E.2d 817, 819 (Ga. Ct. App. 2019) (physical precedent only); *Pettigrew v. Citizens Tr. Bank*, 229 B.R. 39, (N.D. Ga. 1998)

This case is one of those "relatively rare situation[s] where the plaintiff cannot show that the defendant's alleged negligence was the cause in fact . . . of [his] injuries." On the issue of cause-in-fact, Plaintiff effectively asks the jury to make three inferences,

each of which is necessary to prove that, had Defendant Rickerson acted differently, Mixon's injuries would not have occurred. First, Plaintiff would ask the jury to infer that had Defendant Rickerson correctly performed the medical screening, he would have elicited an accurate response from Mixon as to her medical condition and the medications she was taking. *See* [Doc. 50, at p. 18] ("*If* Defendant Rickerson had . . . learned what medications Ms. Mixon was taking . . . .") (emphasis added). Second, Plaintiff would ask the jury to infer that had Defendant Rickerson received such information from Mixon, he would have taken steps to ensure she received appropriate medical care. [*Id.*] (outlining two ways Defendant Rickerson would have responded to learning Mixon's salient medical information either of which resulted in her receiving medical care). And finally, Plaintiff would ask the jury to infer that had Mixon received appropriate medical care, she would not have experienced such severe withdrawal symptoms and ultimately death. [*Id.* at 19] (arguing that had Mixon received medical care, she would not have died). The second and third inferences are supported by record evidence, but the first one is not. *See* [Doc. 39, at 56:23–57:1; Doc. 54-1, at ¶ 5].

Plaintiff provided no evidence whatsoever that, had Defendant Rickerson performed the medical screening correctly, Mixon would have accurately disclosed the requisite medical information. As such, if this issue were to go to a jury, any decision it rendered in Plaintiff's favor on this fact would be based on nothing more than speculation or guess work as to what Mixon *might* have done when asked about her medical history.

*See Jackson*, 57 S.E.2d at 235–36 (holding that where plaintiff's causal theory was based on "guesswork" as to what might have happened in absence of defendant's negligence, defendant is entitled to summary judgment). *See also Ogletree v. Navistar Int'l Transp. Corp.*, 535 S.E.2d 545, 550 (Ga. Ct. App. 2000) (holding that where issue of causation turns on unsupported speculation as to what someone might have done, defendant is entitled to summary judgment).

If anything, the evidence in this case actually shows that Mixon would not have been forthcoming with her medical information. Mixon had multiple opportunities in the days following her screening to furnish this information to various Defendants but declined to do so despite her allegedly worsening condition and her own awareness that she was detoxing. [doc cites]. Because Plaintiff failed to provide evidence that would allow a jury to find in his favor on an essential element of his claim for breach of a ministerial duty against Defendant Rickerson, the Court must grant Defendant Rickerson's Motion for Summary Judgment on this claim.

### b.    State-law Claim Against Defendants Lindsey and Boyd

The Court finds fact questions remain that prevent the Court from concluding that Defendants Lindsey and Boyd are entitled to official immunity on Plaintiff's breach of a ministerial duty claim. Applying the framework described above, the first question is whether Defendants Lindsey and Boyd were fulfilling a ministerial duty or a discretionary duty in this case. Plaintiff argues that, under Georgia law, the provision of

medical care to inmates is a ministerial act. *See* [Doc. 50, at p. 20] (citing *Cantrell v. Thurman*, 499 S.E.2d 416, 421 (Ga. Ct. App. 1998) ("Providing adequate medical attention for inmates under defendants' custody and control is a ministerial act . . . and does not involve the exercise of discretion . . . . In contrast, the determination of what medical treatment to provide is an act of discretion subject to official immunity.") *overruled on other grounds by Tattnall Cty. v. Armstrong*, 775 S.E.2d 573 (Ga. Ct. App. 2015). By contrast, Defendants Lindsey and Boyd argue that, while the provision of medical care may be ministerial, *how* they provided medical care to Mixon was within their discretion. *See* [Doc. 42-1, at pp. 17–18] (citing *Howard v. City of Columbus*, 521 S.E.2d 51 (Ga. Ct. App. 1999)).

The Court agrees with Plaintiff that there is at least some evidence that Defendants Lindsey and Boyd breached a ministerial duty. Allow the Court to explain. Although Defendants Lindsey and Boyd are correct that they exercise discretion in deciding what medical treatment to provide, there is no exercise of discretion when they fail to provide any treatment at all despite knowing of substantial medical risk. The case Defendants Lindsey and Boyd cite makes this clear.

In *Howard*, the Court concluded that when the defendants in that case undertook a specific course of treatment for an inmate's medical condition, the decision to undertake that treatment was shielded from liability by official immunity—a fairly unremarkable result in light of *Cantrell*. *See* 521 S.E.2d at 68. But the Court was not finished. It went on

to conclude, however, that when the inmate's condition deteriorated to the extent that the jail's protocols required transfer to a medical facility, the defendants breached a ministerial duty when they failed to provide such a transfer. *See id.* Thus, *Howard* tells us that a jail official breaches a ministerial duty when he fails or refuses to provide care that he is obligated to provide. And there is *some* evidence that that is exactly what happened here. If Mixon was suffering from opioid withdrawals and Defendants Lindsey and Boyd knew of this risk to Mixon, then they were obligated to provide Mixon with adequate medical care as a matter of Georgia law. In light of such obligation, a jury *could* find that they did not exercise any discretion in deciding not to treat Mixon's condition. Consequently, the Court finds that they are not entitled to official immunity.

3.    Punitive Damages and Attorney's Fees

At the end of their brief, Defendants Lindsey, Boyd and Rickerson incorporate by reference two sections from Defendant Wilkinson County and Chatman's Motion for Summary Judgment arguing that Plaintiff is not entitled to punitive damages or attorney's fees. *See* [Doc. 42-1, at p. 18]. But the section these Defendants incorporate by reference deals exclusively with the unavailability of punitive damages in the context of a claim based on vicarious liability rather than individual liability. *See* [Doc. 27-2, at pp. 17–18]. For his part, Plaintiff directed the Court to authority permitting an award of punitive damages in the context of a deliberate indifference claim based on the defendant's personal participation. *See* [Doc. 51, at p. 19] (citing *Riley v. Camp*, 130 F.3d

958, 980 (11th Cir.1997)). Consequently, the Court denies these Defendants' Motion for Summary Judgment on the issue of punitive damages and, frankly, admonishes them to be more thoughtful about what they incorporate by reference in the future.

As for the attorney's fees, everyone seems to be on the same page: The Court cannot award fees on the federal law claims until one side prevails and attorney's fees are not appropriate for Plaintiff's state-law claims. Thus, the Court denies Defendants' Motion for Summary Judgment on this issue as well.[10]

### C.    Defendant King's Motion for Summary Judgment [Doc. 43]

As noted above, Plaintiff asserts three claims against Defendant King, the jail administrator in charge of the day-to-day operation of Wilkinson County Jail. First, he claims that Defendant King was deliberately indifferent to Mixon's serious medical need. Second, he claims that Defendant King negligently breached a ministerial duty under state law. Finally, he claims that Defendant King is liable in his supervisory capacity for implementing an unconstitutional policy that caused Mixon's injuries. Defendant King is not entitled to summary judgment as to the first and second claims because factual disputes remain as to whether Mixon was suffering from a serious medical condition and whether Defendant King knew of a substantial risk of serious harm to Mixon. However,

---

[10] Defendant King raised the same two issues in the same entirely unsatisfying way in his Motion for Summary Judgment. *See* [Doc. 43-1, at p. 18]. Not surprisingly, the Court was just as unimpressed with the handling of these issues in Defendant King's motion. For the reasons explained above, this part of Defendant King's motion is denied.

Defendant King is entitled to summary judgment on Plaintiff's supervisory liability claim because, even assuming the allegedly unconstitutional policies existed, Plaintiff provided no evidence that these policies caused Mixon's injuries.

### 1. § 1983 Deliberate Indifference Claim

The Court applies the same framework outlined in Section B.1, and finds that factual disputes remain on issues of material fact that prevent it from granting Defendant King's Motion for Summary Judgment.

#### a. Serious Medical Need

As discussed above, the Court finds that, at a minimum, a fact question remains as to whether Mixon suffered from a serious medical need. *See supra* § B.1.a.

#### b. Subjective Knowledge of Risk of Serious Harm

Although the Court was hesitant to conclude that Plaintiff introduced evidence from which a reasonable jury could conclude that Defendants Lindsey and Boyd had subjective knowledge of a substantial risk of serious harm to Mixon, it has no problem concluding that there is evidence that Defendant King had such knowledge. Here, there is evidence that Defendant King was aware that Mixon was suffering from symptoms consistent with drug withdrawals, that he knew that drug withdrawals presented a serious medical risk, and that Hartley raised the possibility that Mixon was suffering from drug withdrawals with him. *See* [Doc. 52-3, at ¶ 17; Doc. 30, at 165:2–15]. In short— the same scant evidence Plaintiff relied on to create a jury question with regard to

Defendants Lindsey and Boyd's knowledge also applies to Defendant King.

But, three other pieces of evidence make this an easy call for the Court. First, Defendant King had actual knowledge that Mixon had a valid prescription for oxycodone that, if withheld, created a real risk of drug withdrawals. *See* [Doc. 30, at pp. 205–210]. Second, the record contains evidence that, as a matter of practice, Defendant King withheld these types of medication to "dry out" detoxing inmates. *See* [Doc. 52-4, at ¶ 9]. Finally, Defendant King stated that if he was told that an inmate was detoxing, he would generally believe such information. *See* [Doc. 30, at 167:22–168:2]. Thus, if the jury finds that Hartley did tell him that Mixon was detoxing, the jury could infer that, based on Defendant King's own testimony, he believed Mixon was detoxing. Considering the ample evidence that Defendant King had knowledge of a substantial risk of serious harm to Mixon, the Court finds that there is a jury question as to whether Defendant King knew that Mixon was suffering from drug withdrawals in the days preceding her death.

> c.     **Disregard of Substantial Risk by Conduct that was more than Grossly Negligent**

The Court finds that there is evidence that Defendant King disregarded a substantial risk of serious harm to Mixon by conduct that was more than grossly negligent. It is undisputed that Defendant King took no steps whatsoever to treat Mixon's condition or otherwise provide her with medical care. As discussed previously, a jail official's conduct satisfies the "more than gross negligence" standard for a deliberate indifference claim when the official knows that an inmate's medical condition subjects

her to a substantial risk of serious harm but fails entirely to provide the necessary medical care. *See McElligott*, 182 F.3d at 1255. Assuming a jury finds that the actual knowledge component of Plaintiff's claim is met, the Court easily concludes that Defendant King's conduct disregarded a substantial risk of serious harm to Mixon under this standard. Defendant King did not provide Mixon with any medical care nor did he take steps to set up an appointment with the jail's doctor upon learning that Mixon had a prescription for certain medication that made her susceptible to drug withdrawals. In light of this evidence, a jury could find that Defendant King disregarded a substantial risk of serious harm to Mixon by conduct that was more than grossly negligent.

### d. Causation

The Court addressed Defendant King's arguments on the issue of causation in Section B.1.c. As explained there, the Court concludes that the issue of causation in this case is best reserved for resolution by a jury.

### e. Clearly Established Right

As discussed in Section B.1.d, the law was clearly established at the time of Mixon's death a jail official could not knowingly disregard an inmate's serious medical need. *See McElligott*, 182 F.3d at 1255. Accordingly, if the jury finds that Defendant King knew of Mixon's condition yet failed to provide medical care, then he violated Mixon's clearly established constitutional rights. Notwithstanding this fairly straightforward rule in an otherwise murky area of the law, Plaintiff argues that "no case law exists in the

40

Supreme Court, Eleventh Circuit, or in the Georgia Supreme Court that required Captain King to immediately give Decedent her 'as needed' medication . . . that had not been requested by Decedent or approved by a physician." [Doc. 43-1, at p. 15]. Defendant King may be correct, but this argument completely misses the point. The issue here is not with Defendant King's failure to just hand over Mixon's medication. Rather, the issue is with Defendant King's response when he allegedly became aware of the substantial risk of serious harm to Mixon posed by her drug withdrawals, and there is no shortage of cases that clearly establish Defendant King's obligation to provide medical care under such circumstances. Consequently, the Court finds that the law was clearly established at the time of Mixon's death that, if Defendant King was aware that Mixon faced a substantial risk of serious harm, then he was obligated to provide her medical care.

2. **State-law Breach of Ministerial Duty**

The Court denies Defendant King's Motion for Summary Judgment as to Plaintiff's claim for a breach of a ministerial duty under Georgia law for the same reasons it denied Defendants Lindsey and Boyd's Motion for Summary Judgment on this claim. *See supra* Section B.2.b. To summarize, the Court finds that, as a matter of Georgia law, the provision of medical care to inmates in county jails is a ministerial duty. *See Cantrell*, 499 S.E.2d at 421. Thus, when an official knows of an inmate's need for medical care but does nothing, he breaches a ministerial duty. Granted, the determination about what care to provide is within the official's discretion, but this rule only applies where the official

actually makes a determination about what care to provide. *See id.*

There is evidence from which a jury could conclude that Defendant King knew that Mixon was suffering from a serious medical condition but did nothing to provide her with medical care. If a jury agrees with Plaintiff as to these facts, then Defendant King breached his ministerial duty to provide medical care to Mixon and is therefore not entitled to official immunity.

3. **Supervisory Liability**

Defendant King is entitled to summary judgment on Plaintiff's supervisory liability claim. Supervisory liability claims under § 1983 are notoriously tough to bring because § 1983 does not allow claims based on vicarious liability. *See Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003). Consequently, a plaintiff bringing such a claim must show "that a causal connection exists between the supervisor's actions and the alleged constitutional violation." *Keith v. Dekalb Cty.*, 749 F.3d 1034, 1047–48 (11th Cir. 2014). As the Eleventh Circuit has noted,

> [t]here are three ways to establish such a causal connection: when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. Alternatively, the causal connection may be established when a supervisor's custom or policy ... result[s] in deliberate indifference to constitutional rights or when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.

*Harper*, 592 F.3d at 1236 (quoting *Cottone*, 326 F.3d at 1360–61). In short, for Plaintiff's supervisory liability claim against Defendant King to survive, there must be evidence

that Defendant King (1) implemented an unconstitutional policy and (2) that policy caused Mixon's injuries. As for the first element, Plaintiff argues that "Defendant King is responsible for the jail's custom or practice of systematically preventing inmates who are at risk of withdrawal from accessing medical and the jail's longstanding practice of not performing intake medical screening[s]." [Doc. 51, at p. 17]. For his part, Defendant King simply points to several good policies that existed at Wilkinson County Jail alongside the alleged unconstitutional policies, including a policy of sending inmates with medications to the jail's doctor and calling EMS when he learns an inmate is withdrawing. *See* [Doc. 43-1, at pp. 10–11].

At the outset, the Court finds that Plaintiff's claim based on the alleged practice of inadequately screening inmates must fail. As previously discussed at length, Plaintiff offered no evidence of a causal connection between an inadequate screening and the harms Mixon suffered. Consequently, Plaintiff cannot show that, had Defendant King remedied this practice, Mixon would not have died. The Court also finds that there is no evidence that the alleged policy of drying out detoxing inmates caused Mixon's harm. There is no evidence that Defendants Lindsey and Boyd were attempting to comply with a policy of drying out detoxing inmates when they allegedly denied Mixon medical care. If anything, the evidence is to the contrary. Defendant Lindsey testified that the policy at Wilkinson County Jail was to provide detoxing inmates with the necessary medical care—including calling EMS—and placing the inmate in a private cell for continuous

monitoring. *See* [Doc. 38, 82:15–25, 97:8–15, 99:5–15]. Defendant Boyd testified somewhat

differently, but his testimony still supports the conclusion that he did not deny Mixon

medical care in an effort to comply with an alleged policy of drying out detoxing inmates.

Specifically, Defendant Boyd testified that he was not aware of an official protocol for

dealing with inmates going through withdrawal. *See* [Doc. 31, at 70:15–18 & 71:2–5].

While this may raise questions about the sufficiency of the policies at Wilkinson County

Jail, it is self-evident that Defendant Boyd could not have denied Mixon medical care on

the basis of an alleged policy of which he was not aware. Because Plaintiff cannot show

that either of Defendant King's allegedly unconstitutional policies caused Mixon's harm,

the Court grants Defendant King's motion for summary judgment on this claim.

> ### D.   <u>Defendants' Motion in Limine [Doc. 44]</u>

The final motion before the Court is Defendants' Motion in Limine to partially

exclude the testimony of Plaintiff's expert witness, Dr. Fowlkes. Expert testimony is

admissible if

> (1) the expert is qualified to testify competently regarding the matters he
> intends to address; (2) the methodology by which the expert reaches his
> conclusions is sufficiently reliable as determined by the sort of inquiry
> mandated in *Daubert;* and (3) the testimony assists the trier of fact, through
> the application of scientific, technical, or specialized expertise, to
> understand the evidence or to determine a fact in issue.

*United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *City of Tuscaloosa v.*

*Harcros Chems. Inc.*, 158 F.3d 548, 562 (11th Cir. 1998). Rulings on the admissibility of

expert testimony—like all evidentiary rulings—are an in the exercise of the Court's

discretion. *See Burchfield v. CSX Transp., Inc.*, 636 F.3d 1330, 1333 (11th Cir. 2011). Here, Defendants do not contest Dr. Fowlkes's qualifications. *See* [Doc. 44, at p. 5]. However, Defendants do argue that certain portions of Dr. Fowlkes's testimony must be excluded for failing to satisfy at least one of the two remaining prongs of the above test.

### 1.    Reliability

Defendants argue that Dr. Fowlkes's following statements were not based on reliable methods: (a) Defendant Rickerson should have been aware that a withdrawal would occur and there should have been a plan in place to monitor Mixon for withdrawal; (b) "[Mixon] was 'clearly [] suffering from significant opiate withdrawal'"; and (c) [Mixon]'s death was caused by benzodiazepine withdrawal. In his Response, Plaintiff maintains that Defendants' objection to Dr. Fowlkes's testimony that Defendant Rickerson should have been aware that Mixon was a withdrawal risk is mooted by Plaintiff's withdrawal of his deliberate indifference claim against Defendant Rickerson. The Court, therefore, denies this portion of Defendants' Motion in Limine as moot. Accordingly, the Court must only resolve whether Dr. Fowlkes's testimony that Mixon was suffering from opiate withdrawal and his opinions regarding her cause of death were based on reliable methods.

### a.    Opioid Withdrawal

The Court agrees with Plaintiff that Dr. Fowlkes may testify that Mixon was suffering from opioid withdrawal during her detention at Wilkinson County Jail.

Defendants' argument on this issue is limited to a passing objection without any analysis. Thus, the Court cannot fully ascertain Defendants' reasoning for this objection. *See* [Doc. 44, at p. 7]. Meanwhile, Plaintiff argues that Dr. Fowlkes's testimony that Mixon suffered from opioid withdrawal was based on evidence showing Mixon suffered from the "classic symptoms" of opioid withdrawal and that she had been prescribed large quantities of opioid for several years prior to her detention. *See* [Doc. 54, at pp. 5–6]. Defendants do not address this issue in their reply.

In the absence of any real argument from Defendants on this issue, the Court concludes that Dr. Fowlkes's testimony that Mixon was suffering from opioid withdrawal is admissible. Dr. Fowlkes reviewed Mixon's medical history and her symptoms and provided an opinion as her medical condition during her detention. Nothing about this testimony shows that Dr. Fowlkes used unreliable methods to arrive at this conclusion. Accordingly, this portion of Defendants' Motion in Limine is denied.

b. **Cause of Death**

The Court is likewise satisfied that Dr. Fowlkes's process for arriving at his conclusion that Mixon's death was caused by benzodiazepine withdrawal or electrolyte derangement caused by her withdrawal symptoms was reliable. Dr. Fowlkes indicated that he used a differential diagnosis methodology to narrow down the potential causes of Mixon's death. *See* [Doc. 52-12, at ¶ 4]. The Eleventh Circuit has found that the differential diagnosis methodology can be a reliable method if the expert "rules out each

46

of the potential causes 'until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely.'" *S. States Co-op., Inc., v. Melick Aquafeeds, Inc.*, 476 F. App'x 185, 188 (11th Cir. 2012) (quoting *Guinn v. AstraZeneca Pharm. LP*, 602 F.3d 1183, 1195 (11th Cir. 2010)). For each cause the expert rules out, the expert must provide a basis for doing so. *See id.*

Defendants argue that Dr. Fowlkes did not provide a basis for excluding as Mixon's cause of death hypertensive cardiovascular disease or seizure related to the withdrawal of Tegretol. *See* [Doc. 44, at p. 8]. But this is untrue. Dr. Fowlkes opined that hypertensive cardiovascular disease was not the likely cause of Mixon's death because the medical examiner's report showed that Mixon had only mild cardiovascular disease. *See* [Doc. 52-12, at p. 3]. Dr. Fowlkes also excluded cessation of Tegretol as a potential cause of Mixon's death because Mixon was apparently prescribed Tegretol off-label and because Mixon did not have a history of seizures. *See* [*id.* at pp. 5–6]. The jury may well reject Dr. Fowlkes's testimony and instead rely entirely on the medical examiner's conclusions regarding Mixon's death, but nothing in Dr. Fowlkes's testimony indicates that he arrived at his opinion by unreliable means.

### 2. Helpfulness

Defendants also argue that Dr. Fowlkes's conclusion that Defendant Rickerson did not perform Mixon's intake screening correctly does not satisfy the helpfulness prong of the test described above. The Court agrees. After reviewing a video recording of Mixon's

medical screening, Dr. Fowlkes concluded that Defendant Rickerson did not perform the screening correctly because the video recording shows Defendant Rickerson filling out the form too quickly to leave time for adequate questioning of Mixon. *See* [Doc. 34, at 39:17–25]. Dr. Fowlkes also cites the fact that Mixon mouth does not appear to move while Defendant Rickerson was filling out the form, indicating that he was not asking her the questions on the screening forms. *See* [*Id.* at 40:2–5].

As is evident from Dr. Fowlkes's reasoning, any lay observer, if informed of the appropriate standards and processes for performing an intake screening could, watch the video in question and make a determination about what happened in that video. Consequently, the Court excludes that part of Dr. Fowlkes's testimony regarding the adequacy of Defendant Rickerson's screening. Dr. Fowlkes may testify as to the appropriate standards and what he would expect to see in a correctly administered medical screening, but he cannot tell the jury that the screening in this case was done incorrectly. The jury is fully capable of hearing the standards from Dr. Fowlkes and then watching the video to determine whether Defendant Rickerson complied with those standards.[11]

---

[11] Plaintiff cites several cases in which a court permitted an expert to testify about their interpretation of a video. *See* [Doc. 54, at p. 12] (citing *Berman v. Sink*, Case No. 1:13–cv–00597–SAB, 2016 WL 8730672 (E.D. Cal. May 27, 2016); *Graddy v. City of Tampa*, No. 8:12-cv-1882-T-24, 2014 WL 1092285 (M.D. Fla. Mar. 19, 2014); *White v. Gerardot*, No. 1:05cv-382, 2008 WL 4372019 (N.D. Ind. Sept. 23, 2008); and *Bates v. White Cty.*, No. C05-12348RSM, 2007 WL 1412889 (W.D. Wash. May 9, 2007)). But these cases are neither binding nor persuasive. These cases involve procedural questions that are not easily reducible to standards that can be conveyed to a jury. By contrast, Dr. Fowlkes can easily explain to the jury that a proper medical screening would include the detainee responding to questions and he can estimate how long an appropriate screening

<u>CONCLUSION</u>

For the reasons explained above, the Court **GRANTS** Defendants Wilkinson County and Sheriff Chatman's Motion for Summary Judgment [Doc. 27] and **GRANTS in part** and **DENIES in part** Defendants Lindsey, Boyd and Rickerson's Motion for Summary Judgment [Doc. 42] and Defendant Thomas King's Motion for Summary Judgment [Doc. 43]. Finally, the Court **GRANTS in part** and **DENIES in part** Defendants' Motion in Limine [Doc. 44]. To be clear, Plaintiff may still bring his § 1983 deliberate indifference claims and state-law breach of a ministerial duty claims against Defendants Lindsey, Boyd and King, but Defendants Wilkinson County, Sheriff Chatman and Rickerson are entitled to summary judgment. Consequently, the Court **DIRECTS** the Clerk of Court to **TERMINATE** these Defendants as parties to this action.

As there are no remaining dispositive motions, the Court sets this case for trial in its August 2019 trial term. A separate order regarding the parties' pretrial obligations will issue separately.

**SO ORDERED** this 23rd day of May, 2019.

**S/ Tilman E. Self, III**
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**

---

would take. The Court is confident that the jury can watch the video and apply these standards to reach their own conclusion about the adequacy of the screening in this case.